UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09-cr-179 |
| | ) | MATTICE/CARTER |
| KELVIN JOHNSON | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant's Motion to Suppress evidence (Doc. 9) discovered during the course of a traffic stop is pending before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Defendant agrees police legally detained the defendant for speeding. Defendant contends, however, that the detention was unlawfully extended after the purpose of the traffic stop was completed. Because I conclude reasonable suspicion arose during the course of the traffic stop to justify the defendant's continued detention, it is RECOMMENDED the defendant's motion to suppress be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on Defendant's motion to suppress on April 14, 2010. Officer Jason Duggan for the government was the only witness to testify. At the time of the traffic stop at issue, which occurred on June 2, 2009, Officer Duggan had been employed by the Chattanooga Police Department for approximately four (4) years. He has approximately three hundred hours of interdiction training in traffic enforcement, interviewing persons, and interpreting criminal behavior.

On June 2, 2009, at approximately 9:40 pm, Officer Duggan recorded defendant with his radar gun traveling north at 73 mph in a 55 mph zone on I-75 within the Chattanooga, Tennessee

1

city limits. Duggan activated his blue lights and the vehicle, a Chrysler PT Cruiser, pulled over to the right shoulder. The defendant driver was the only person in the car. At the time Officer Duggan activated his blue lights, his dash video camera with sound also activated. The government introduced as Exhibit A its video and sound recording of the stop. There is a great deal of traffic noise on the audio.

Over the noise of traffic, Duggan can be heard informing the defendant he was speeding. Duggan asked for his driver's license and the paperwork on the vehicle. He asked defendant where he was heading, and defendant responded "Kentucky." Duggan noticed that sweat was beginning to bead on defendant's forehead even though the defendant had the air conditioning running. When defendant handed over his driver's license, defendant's hands were visibly shaking and he was staring "excessively" at Duggan. Defendant gave Duggan his driver's license and Duggan again asked for the paperwork on the car. Because a PT cruiser has no trunk, Duggan could see into the back seat where he noticed in plain view a container of industrial strength degreaser in the backseat.

Duggan thought defendant's nervousness was beyond what was normal for a traffic stop. Duggan then used his cell phone to telephone "teammate" Officer Curvin, to request his back-up. Duggan also called the Blue Lightning Operations Center (BLOC) and asked for more elaborate record checks on the defendant.

According to the paperwork given to Duggan by the defendant, the vehicle was rented that day at 5 pm, and the rental contract stated the vehicle was to be operated in Georgia and Florida. Seven minutes and thirty-one seconds into the traffic stop, Duggan asked the defendant to exit the vehicle. Both Duggan and the defendant walked to stand behind defendant's vehicle and in front of the patrol car. For safety reasons, Duggan asked the defendant not to put his hands in his pockets.

2

In an effort to calm the defendant and to determine if defendant's nervousness was simply because of the traffic stop or might be based on something more, Duggan told the defendant he was only going to give him a warning ticket, not an actual ticket. Duggan testified the defendant was standing in a "bladed" stance, one foot in front of the other, and his nostrils were flaring, indicating to Duggan, based on his training, that the defendant was in a fight or flight stance.

In an effort to calm the defendant, Duggan began joking about the PT Cruiser and whether or not he would ever drive one. He then asked the defendant where he was going, and the defendant responded "Ashland, Kentucky" near the corner of West Virginia and Ohio. In response to further questions, the defendant stated that he would be there until Friday, he was twenty-six years old, and he was coming from Gainesville, Georgia. Despite his long trip and the fact he intended to stay a few days, the defendant had no luggage, a fact which made Duggan suspicious. Duggan asked him if he was going on vacation or to visit family, and defendant responded he was going to visit a lady he had been talking to for a while. Duggan asked him how long a drive it was to Ashland, and defendant responded seven hours. Duggan asked defendant why the rental contract for the car permitted him to drive the vehicle in Georgia and Florida only, and, before defendant could respond, the phone rang. It was 11 minutes, 20 seconds into the traffic stop.

The caller was the BLOC dispatcher who informed Duggan that the defendant's driver's license was in good order and there were no outstanding warrants, but the dispatcher did give Duggan an "officer's alert." Dispatch informed Duggan the defendant had prior felony gun charges, multiple felony narcotics charges, and an aggravated assault charge. At 13 minutes and 50 seconds into the traffic stop, Duggan ended the phone call with BLOC.

At approximately 14 minutes into the traffic stop, Officer Curvin arrived. In order to keep the defendant calm, Duggan told the defendant that Curvin was his supervisor and had come there

3

merely to observe Duggan. Duggan then asked the defendant again about the Georgia and Florida limitation and the rental contract. The defendant responded that he told the rental company where he was going but they were very busy at the time he rented the car and he didn't know why they limited the driving to Georgia and Florida. At fourteen minutes and 56 seconds into the traffic stop, Officer Duggan gave defendant a warning citation for speeding. He also returned the defendant's driver's license and paperwork. Duggan told the defendant to have a safe trip and shook his hand.

Duggan testified at the suppression hearing that at this point, he wanted the defendant to feel as though he were free to leave, but he would not have allowed the defendant to leave. Instead, as the defendant turned to go, Duggan asked him if he wanted to know of the speed traps along I-75 as he proceeded north. The defendant stated he did, and Officer Duggan began to tell him about the construction zones and other zones where speed limits had been reduced. Duggan then asked the defendant if he (Duggan) could ask him some questions, and the defendant said "sure." Duggan proceeded to ask him if he had anything illegal in his vehicle including cocaine, marijuana, methamphetamine, guns, knives, weapons, packages from other people, and large amounts of cash. The defendant said he did not. Duggan asked him why he had no luggage if he was going to visit a lady friend, and defendant responded he had bought some clothes, underwear and shirts, and that he would buy more when he got to Kentucky. Duggan then asked the defendant if he could search his car. The defendant responded that there was no need to search the car. Duggan asked, "are you telling me no?" The defendant said "yes."

At this point, Duggan asked defendant to come to the side of the patrol car and explained that he was going to call a K-9 unit. He handed defendant off to Officer Curvin, again asking defendant not to put his hands in his pocket. Duggan then telephoned a K-9 unit on duty and asked the officer to come to the site "as quick as you can." It was approximately 18 minutes into the

4

traffic stop. Duggan then turned to the defendant and asked him if he had anything illegal on him to which the defendant stated "no." Duggan asked the defendant if he could search him, and the defendant said "no sir." Duggan then brought the defendant to stand in front of the patrol car so that he would be in front of the dash camera. Duggan proceeded to do a pat down for weapons and explained to the defendant that he had called for a drug dog and asked the defendant to wait at the guardrail while they waited for the dog. Duggan then called the dispatcher to tell the dispatcher that he, Officer Curvin, and K-9 Officer Penney were occupied in order that the dispatcher would not attempt to dispatch them to another call.

At this point, defendant can be heard at times through the noise of the traffic expressing his displeasure at being detained. It is not 20 minutes into the stop. He tells Duggan that he has been profiled and that there is no reason to keep him. Duggan can be heard responding that he is not trying to show him disrespect, that he is simply trying to do his job and that he would be glad to discuss this after the drug dog comes. It is clear, however, that the defendant is not consenting to his continued detention.

Thirty minutes into the stop, Duggan turns off his microphone. At the hearing, he testified that he turned off the microphone because K-9 Officer Penney had arrived, and he (Duggan) never knows what kind of mood an officer will be in when he first arrives on the scene. Sometimes the officer will be in a bad mood and say something inappropriate. Other times he will be in a good mood and make stupid jokes. He wanted to tell Officer Penney what was going on and let him know this was a serious situation before he (Duggan) turned the microphone back on. About a minute later, Duggan reactivated the voice recording and Penney took his drug dog, Max, around the car. Penney walked his dog twice around the car and the dog alerted by sitting down, indicating the odor of contraband.

5

Duggan testified that all drug dogs used by the Chattanooga Police Department are certified by the United States Police Canine Association (USPCA) which is the largest canine certification association in the country. He testified Max is certified by the USPCA and, as do all drug dogs with the Chattanooga Police Department, Max undergoes weekly training.

Penney informed Duggan that Max had alerted and there was probable cause to search. Duggan proceeded to search the vehicle and found a CD case in the front passenger seat. He opened that case and found a hollowed out cigar. Duggan testified that marijuana users often cut the end off a cigar, push the tobacco inside it out with a pencil or other instrument, and fill it with marijuana. This is called a marijuana blunt. He found no other tobacco in the vehicle besides what had originally been in the cigar. Duggan also found a gun, later determined to have been reported stolen, underneath the driver's seat.

### III. Analysis

Plaintiff concedes the initial traffic stop for speeding was constitutional. Plaintiff asserts, however, that once the original purpose of the traffic stop was completed, *i.e.* once Officer Duggan gave defendant a warning ticket, his continued detention violated the Fourth Amendment's prohibition against reasonable searches and seizures. The government agrees that the original purpose of the traffic stop concluded when Officer Duggan gave the defendant a warning ticket for speeding. The government argues, however, that reasonable suspicion developed during the course of the traffic stop which justified defendant's continued detention and that once the drug dog alerted on defendant's car, probable cause existed to search the car.

The government bears the burden of proof to show a warrantless search is justified under the Fourth Amendment. *United States v. Haynes*, 301 F.3d 669, 676 (6th Cir. 2002). "Once the

purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 263 (6th Cir. 1999); *accord*; *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Further, once reasonable suspicion has developed to justify continued detention after issuance of the warning citation, that continued detention must be reasonable in scope, *i.e.* manner of detention and duration, in order to pass Fourth Amendment muster:

> To qualify as reasonable seizures under the Fourth Amendment, Terry detentions must be "limited in [both] scope and duration." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *see also United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (stating that "length and intrusiveness" of a stop are relevant to Terry analysis). Under Terry's duration prong, a stop "must ... last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500, 103 S.Ct. 1319. Under its scope prong, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Ibid.*; see *also United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (stating that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

*United States v. Everett*, _F.3d_, 2010 WL 1286770 *3 (6th Cir. Apr. 6, 2010).

On the other hand, if the continued detention violates the Fourth Amendment then the items seized during the unlawful detention must be suppressed. *Hill*, 195 F.3d at 264 ("If the initial traffic stop is illegal or the detention exceeds its proper investigative scope, the seized

items must be excluded under the 'fruits of the poisonous tree doctrine.'") (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

The government does not contest that, after defendant refused consent to search the vehicle, when Officer Duggan told the defendant to stand between the guard rail and his patrol car while they waited for the drug dog to arrive, defendant was detained. During the suppression hearing, Officer Duggan testified that he based this continued detention on the following behavior observed and information gained during the initial traffic stop:

(1) defendant appeared excessively nervous – far too nervous for normal traffic stop jitters. He had begun to sweat, his hands were shaking, he stared intensely at Officer Duggan;

(2) defendant stood in a "bladed" stance indicating to Officer Duggan, based on his training, that defendant was in a fight or flight mode;

(3) defendant said he was going to see a woman he had never met for several days, but he had no luggage, only a few packs of new underwear and T-shirts;

(4) he was carrying heavy duty industrial degreaser in a car he had rented to go visit a woman. Duggan testified that such cleaner could be used to wipe finger prints;

(5) the rental paperwork for the car limited the car's geographical range to Georgia and Florida, but the defendant was driving in Tennessee en route to Kentucky; and

(6) the defendant had multiple arrests on narcotics charges.

Officer Duggan testified these factors were "not consistent with the innocent motoring public" and, when considered together, gave rise to suspicion that defendant was engaged in criminal activity.

Defendant argues that there could be an innocent explanation for each one of these factors. However, a reasonable suspicion determination must be made by looking at the totality of the circumstances "to see whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 750 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Police officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'"*United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir.2001)). "The evidence offered as grounds for reasonable suspicion is to be viewed using a common sense approach, as understood by those in the field of law enforcement." *Smith*, 263 F.3d at 588. In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to a reasonable suspicion that criminal activity is afoot. *Arvizu*, 534 U.S. at 274-75, 277.

This case is similar to *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999), wherein two defendants driving a U-Haul truck were stopped for speeding. After the truck was pulled over, the officer asked the driver to sit in his patrol car while the officer wrote the driver a citation and checked his license. While the officer was checking the driver's license and the rental agreement for the truck, the officer also questioned the defendants about their travel plans. During the questioning the officer noticed some discrepancies in the defendants' stories. The officer also noticed the driver's hands shook when he gave the officer his license. The officer could also see in plain view a large amount of tissues on the floor of the truck which made him suspicious as it had been his experience that people who snort cocaine have constantly running noses. While

9

waiting for verification of the driver's license, the officer asked for consent to search the truck. Consent was refused. Sometime before the officer asked for consent to search, the officer issued a "courtesy" citation to the driver. After consent to search was refused, the verification of the driver's license came back indicating the license was valid and there were no restrictions on it. At this point, the officer decided to run a canine sniff of the vehicle with the narcotics dog which was with him in his patrol car. The officer then placed the passenger in the patrol car with the driver. It took approximately one to two minutes for the dog to sniff the truck whereupon he alerted indicating the presence of illegal drugs in the truck. A search was then made of the truck which revealed cocaine. The defendants in *Hill* argued the evidence seized should be suppressed because the detention impermissibly exceeded the scope of the initial stop. The Sixth Circuit held "the district court did not err in finding that Deputy Whitlock had formed a reasonable suspicion that Defendants were carrying contraband sufficient to justify extending the purpose of the traffic stop to allow Spanky to do a canine sniff of the U-Haul." *Id.* at 272.

In the instant case, there were discrepancies between the factual observations made by Officer Duggan and the defendant's story that he was going to visit a lady friend in Ohio several days for the first time. Significantly, defendant had no clothing other than what he was wearing and some new white T-shirts and underwear. Additionally, he was driving in a place he was not authorized to drive. While defendant did offer an explanation for these suspicious factors, "[p]olice officers, charged with the difficult task of protecting the public, are not required to consider every possible innocent explanation for each suspicious incident they observe." *United States v. Keith,* 559 F.3d 499, 511 (6th Cir. 2009). Other information which is less significant but should nevertheless be considered in the reasonable suspicion calculus are defendant's extreme

nervousness, the defensive posture he used when talking to Officer Duggan, and the presence of the industrial strength degreaser – an item out of place given that he was driving a rental car to pay a visit on a lady friend. Also, defendant had been arrested several times on narcotics charges and once for assault. *See United States v. Bravo*, 306 Fed. Appx. 436, 439 and 441 (10th Cir. Jan. 7, 2009) (narcotics arrest was appropriate factor in determining officer had reasonable suspicion to continue detention of motorist after initial purpose of traffic stop was concluded.)

This is a difficult call. The undersigned is certain that Officer Duggan suspected the defendant of carrying contraband in the vehicle; however, the issue is whether this suspicion was reasonable based on the specific factors Duggan has articulated. It is entirely possible that there was, indeed, an innocent reason for each of these factors. However, "*Terry* [*v. Ohio*, 536 F.3d 542 (1968)] accepts the risk that officers may stop innocent people." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000), and "even a string of innocent behavior added together may" satisfy the reasonable suspicion standard. *United States v. Richardson,* 385 F.3d 625, 631 (6th Cir.2004) (citing *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002)). "[T]he question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Jacob,* 377 F.3d 573, 577 (6th Cir. 2006) (citing *Arvizu*, 534 U.S. at 274-75).

The undersigned concludes, based on consideration of all factors as a whole, that continued detention to some degree was justified and permissible under the Constitution. The undersigned must next examine the scope of the continued detention and determine, based on the information known to the officer, whether this continued detention was reasonable or impermissibly intrusive. *See United States v. Torres-Ramos*, 536 F.3d 542, 551-52 (6th Cir.2008) ("If the detention is proper, then the second question is whether the degree of intrusion ... was reasonably related in

11

scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances.")

In the instant case, the manner of detention was not unreasonable. Defendant was asked to stand between the guardrail and the patrol car. He was not handcuffed. No guns were drawn. He was not treated roughly. The officer was polite and calm.

The length of the detention was not unreasonable either. They waited approximately 30 to 35 minutes from the time the warning citation was given until the drug dog alerted on defendant's car. While defendant's continued detention was certainly an intrusion, it was not an unreasonable intrusion given what the officer reasonably suspected at the time.

Once the drug dog alerted on defendant's car, Officer Duggan had probable cause to search it. *Torres-Ramos*, 536 F.3d at 554 ("[A] positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance.") (citing *United States v. Diaz,* 25 F.3d 392, 393-94 (6th Cir. 1994)).

IV. Conclusion

Because I find that the continued detention of the defendant following the issuance of the warning citation was supported by reasonable suspicion and was reasonable in its scope, it is RECOMMENDED that Defendant's motion to suppress (Doc. 9) be DENIED.[1]

Dated: May 19, 2010
s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).